Good morning, Your Honors. May it please the Court. Lauren Tucholsky of Hadsall and Stormer for Appellant and Plaintiff Patricia Hesser METOYER. The central issue on appeal is whether the District Court erred in concluding that Dr. METOYER failed to present evidence that the Guild's proffered reason for termination was Cooper's report, or the PWC report, was a pretext for a retaliatory and discriminatory termination. On this point, the District Court stands in direct opposition to the State Trial Court, which looked at the same evidence and on the same record concluded that Dr. METOYER had presented sufficient evidence of pretext. This disagreement shows that reasonable minds can differ on the basis of the evidence presented here today in the record. Because evidence must be viewed in the light most favorable to the non-moving party, in this case Dr. METOYER, this disagreement should be resolved in Dr. METOYER's favor. Therefore, this Court should reverse and remand, and Dr. METOYER should be permitted to try her case to a jury. Let me just ask a preliminary question. How can you possibly show that METOYER's dismissal was pretextual without any direct evidence of discriminatory statements or actions made by Mr. McGuire? Your Honor, while I agree with you that we have not submitted evidence that Mr. McGuire made directly racist comments, there is substantial circumstantial evidence that Mr. McGuire was motivated by a discriminatory animus. And as this Court has repeatedly stated time and again, circumstantial evidence and direct evidence both must be viewed in the same light. In other words, it's not always true that direct evidence of discrimination is more powerful than circumstantial evidence. What is the circumstantial evidence that McGuire, not Chassman, not anybody else, but McGuire was motivated, not heard, not affected, but motivated? Your Honor, the best evidence that McGuire was motivated by retaliatory animus comes with respect to the timing of the investigation. The timing of the investigation, the investigation occurred directly after Dr. METOYER stated in a meeting at which McGuire was present that she intended to present to the National Plenary Panel evidence that the Guild had been inflating its minority statistics on EEO-1 reports. The issue there was that Dr. METOYER had become aware, based on complaints by a Human Resources employee named Valerie Cattell, that the Guild had been classifying low-skilled and low-wage African-American employees as officers and managers. And they did this to make it appear as if the Guild were actually employing high-level African-American employees when, in fact, the department heads at the time that METOYER was hired were entirely Caucasian. There wasn't a single person of color other than Dr. METOYER. Directly after Dr. METOYER stated at this meeting that she intended to take this issue to the National Plenary and to make a big deal out of it, the investigation was started. That's one piece of evidence. The other piece of evidence is that Mr. McGuire was well aware of the numerous complaints of race discrimination that Dr. METOYER brought to the attention of senior staff. She presented evidence below that she presented these complaints of race discrimination on behalf of other African-American and minority employees, not only to Chassman and Schick, but to McGuire himself. And those two pieces of evidence are very persuasive. And this Court has repeatedly held that the timing of an investigation, the timing of a termination, if a plaintiff can show that an investigation or a termination, any kind of adverse employment action took place directly after making a complaint of race discrimination, threatening to take an unethical or an unlawful issue to blow it wide open, this Court has held that that is good evidence, good circumstantial evidence that the action was taken for a retaliatory reason. And those... May I ask you, what precipitated the investigation? Well, Your Honor, that's an interesting question. In the Court below, defendants presented conflicting evidence about what it was exactly that began the investigation. PwC submitted two preliminary reports before submitting its final report. Is this answering my question? Because I thought someone in the Board, an individual who worked in the pertinent department, came forward and brought this to the attention of the Screen Actors Guild. That's correct, Your Honor. However, there is conflicting evidence that was presented by appellees themselves in the Court below as to how this investigation got started. And we believe that that's further evidence of pretext here. I can tell you what the two conflicting reasons were. I personally don't know what the actual reason was, and I don't think the District Court could have known either. In fact, the State Trial Court, when it found that there was sufficient evidence of pretext, relied on the conflicting reasons provided by defendants in their evidence that there was pretext here. It focuses on an employee named Elaine Graham. This was a temporary employee who was placed in the Affirmative Action Department to coordinate a project there. In PwC's initial preliminary report that they submitted, they said that concerns were raised by Graham after she started working. Her salary was paid by an IACF grant, but then the Guild found money somehow to the remainder of the IACF grant. That's what the Price Waterhouse Report says was the impetus for the investigation, that Graham's suspicions were raised when the IACF grant money suddenly became freed up and she didn't know how Mottoyer was going to spend it. That was what PwC first said in its report. During Elaine Graham's deposition, she was confronted with the PwC initial report and asked, was this what initially concerned you about the grant? And she replied under oath, I have no idea what PwC is talking about. PwC never interviewed me. I've never seen this report before. I didn't even know that an investigation was going on until after the fact. She said in her deposition that she became concerned when another employee presented an invoice to her that looked suspicious, and she claims that she then went and reported this up the chain through Chasman, through McGuire, and that's how the issue came to bear. When the state trial court looked at this evidence, he smelled a rat. He said, I don't know what's going on here, but I know that it's not appropriate for me to resolve this on summary judgment. This is evidence, further evidence in his mind, in the state trial court's mind, of pretext. And this was only one of many, many factors that, in which the trial court, in the state court, smelled a rat. There is significant, overwhelming evidence of pretext here, just looking at defendant's own evidence. Counsel, we got a 28J letter. Did you get a copy of it? I did, Your Honor. The state court proceedings were ultimately concluded in the Screen Actors Guild's favor. What's your response to that, that even though the district court smelled a rat, at the end of the day, there was no finding of retaliation? Your Honor, I think it's important to understand the procedural history, because it is confusing, and to understand why the state appellate court decision should have absolutely no bearing on the present appeal before this Court. Well, you were the one who brought it out that the state court judge smelled a rat. So you kind of injected the state court proceedings into our consideration. That's absolutely correct. And the state trial court looked at the evidence on a summary judgment motion, and found that there was sufficient evidence of pretext. The discrimination claims were then taken away from the state court. Those are the claims that went up to federal court. The sole issue before the state court, at the end of the day, was defendant's defamation claim. I thought it was wrongful discharge, too, wasn't it? Wasn't there a wrongful discharge? I respectfully disagree, Your Honor. I think the only issue before, the only claim that Judge Walter sent back to judge, to the state court, was the defamation claim. The defamation claim was based on statements that appeared in a newspaper called The Hollywood Reporter. California law has a special statute called a slap, anti-slap statute, under which a party, a defendant, can file what's called a special motion to strike. And in that special motion to strike, they say, this lawsuit is based on conduct or statements that are absolutely protected by the Constitution. When a court, a state California court, is adjudicating an anti-slap motion, they're required to make a finding as to probability of success on factual disputes. In order to oppose the anti-slap motion, Dr. Mottoyer argued that she did have a probability of success on the merits. The guild came back and said, for all of these reasons, she doesn't have a probability of success on the merits. And in the trial court, one of the reasons they gave was that there was no evidence that defendants had made the statements. Dr. Mottoyer couldn't show a causal nexus between defendants making the statements and the statements appearing in The Hollywood Reporter. In other words, there was no publication. Publication is an element of defamation. On this basis and on this basis alone, the state trial court said that Dr. Mottoyer could not show a probability of success on the merits. The state trial court in no way revisited its previous holding that she had shown sufficient evidence of pretext. The only basis that the state trial court threw out her defamation claim was that she could not show the element of publication. The case then went up to the state appellate court. The state appellate court affirmed the decision of Judge Minning on the publication ground. It then went a step further than Judge Minning and said that the guild had shown, had proven its defense, that the allegedly defamatory statements were true. I personally do not know the record upon which the appellate court made that conclusion. In the context of an anti-slap motion, there is no requirement that the court view the facts in the light most favorable to Dr. Mottoyer as there is here. The state appellate court made a number of troubling statements in its decision which suggests that it didn't look at any of the evidence that Dr. Mottoyer submitted to oppose summary judgment. For example, one of the statements that the appellate court made was that Dr. Mottoyer had failed to present any evidence that the statements appearing in the Hollywood Reporter argument. May I interrupt you? Sure, Your Honor. Was there an appeal petition for review to the California Supreme Court? The decision just came down on May 23rd, 2006. So So you still have time? We do, Your Honor. All right. So it's not a final decision yet? That's correct, Your Honor. If it were a final decision, wouldn't we be bound by that? No, Your Honor. I do not believe so. The status of the case was it was an anti-slap motion. Here, this is a motion for summary judgment. But the court of appeals went beyond the anti-slap motion and found, according to what you just said, that the defamatory statements, which I take it had to do with whether Dr. Mottoyer was stealing or not, were true. The precise statements that were found to be true were that some of the statements that were made in the PWC report were, in fact, made. And there's a difference. In this case, Your Honor, in this appeal, we have good evidence that PWC predetermined the outcome of its investigation, that the circumstances under which the investigation was even initiated was motivated by racial and retaliatory animus. That issue simply was not before the state court. So, in other words, Your Honor, let's assume, for the sake of argument, that some of the statements that appeared in the PWC report were true. The question still remains, were similarly situated employees outside of plaintiff's protected group treated the same way as she was? That question was not before the court in the anti-slap motion. That question is before the court now. So let me give you an example. There have been a number of federal appellate court cases that look at cases in which a plaintiff is found to have engaged in wrongdoing in the case. One of those cases is Delisanti. In Delisanti, the plaintiff was an insurance claims adjuster, and she made several complaints of discrimination, age discrimination, and sex discrimination to her supervisors. Shortly after she complained, an investigation was conducted as to whether she had basically stolen money from the company by inflating her gas reports. And the investigation turned up very good evidence that she had, in fact, fabricated handwritten receipts and that she had engaged in wrongdoing. The employer came back and said, look, we have a policy of investigating all of our employees. We didn't single this person out simply because she had made these complaints. We have a consistent policy of reviewing all gas reimbursement reports, and she was treated just the same as everybody else. The employee then came back and said, that's not correct. We have evidence that there were 200 similarly situated employees who had suspicious evidence that they had been stealing money from the company in this manner, and none of those people were investigated. In that case, the court said that because the plaintiff had come forth with sufficient evidence showing that other employees outside of the protected class who had not complained about discrimination, she had shown that they were not treated similarly. Those people were not similarly investigated. And the only difference between plaintiff and those other employees was that she had engaged in protected conduct. She had made complaints. Similarly here, even assuming that some of the statements made in the PWC report were correct and that she had engaged in wrongdoing, plaintiff presented substantial evidence in the court below that three other similarly situated white employees of the guild were not investigated despite numerous complaints both by members, board directors, and suspicious activity with respect to their grants. PWC Is it similar activity? Well, an investigation was never even started. That's a very good question. When Dow and Hunt, Hunt is the guy who actually did the PWC investigation, Dow is the IACF director who submitted a declaration in support of defendant's motion for summary judgment below. When those two individuals submitted their declarations below, here's what they said. The purpose of the investigation is to investigate all outstanding IACF grants. They disclaimed the notion that the investigation was started just to look at Dr. Mottoyer. They wanted to make it seem as if the PWC investigation was this neutral investigation that had nothing to do with Dr. Mottoyer and which just happened to turn up evidence that Dr. Mottoyer had engaged in wrongdoing. Suppose a whistleblower had fingered Dr. Mottoyer and Dr. Mottoyer only. Would that have been discriminatory investigation to go after Mottoyer? Let me see if I understand your question. So assuming that. Let's say Elaine Graham's story, the first story, is right, that she was concerned about where IACF funds were going and she only suspected Dr. Mottoyer, not anybody else. Would that mean that if they investigated only Dr. Mottoyer, even though those other people had been also peculating, that that would be discriminatory? Your Honor, that hypothetical situation is not what actually occurred here, because there – first of all, there was substantial evidence that others had engaged in wrongdoing. You're not answering my hypothetical. Okay. Let me see. Do you have an answer for my hypothetical? If the facts were that only one whistleblower fingered one malefactor. Yes. Would it be discriminatory because that malefactor was in a particular class? I have two responses. If the investigator came back and gave a report to you – let's pretend that you're the employer – and the report says the purpose of this report is to present our findings as to an investigation on all outstanding IACF grants, which is what happened in this case. There was an attempt to make it seem as if the investigation was into all outstanding grants. So let's assume that your hypothetical is correct. Why then would the person who undertook the investigation come back and try to make it seem as if it was some kind of neutral, broad-based investigation? This just doesn't make any sense. Then that is evidence of pretext. Unless he was trying to be politically correct. And that is evidence of pretext. I have no idea, Your Honor. And this is why it's clear that the district court had to resolve disputes of fact. It's clear that the district court had to make credibility findings here. Was he going to believe Dow and Hunt, who claimed that this was a neutral investigation into all outstanding IACF grants, despite the text of the report, which only presented findings as to Dr. Mottoyer, which presents conclusory statements that 26 IACF grants were investigated, but failed to set forth any support for that assertion, failed to set forth any evidence that any other grants were in fact investigated? Who is to be believed here? Why was this investigation actually undertaken? Counsel, you've exceeded your time. We'll give you one minute for rebuttal. Thank you, Your Honor. May it please the Court, Eric Amdurski on behalf of Respondents, Screen Actors Guild, John McGuire, and Leonard Chasman. Putting us back into the shoes of the district court and what was presented to the district court when the motion for summary judgment was filed, Respondents put forth specific, meticulous evidence showing from the very get-go of how the investigation started into Dr. Mottoyer's wrongdoing. What was that evidence? The evidence was a declaration starting with Sophia Banks, the person you referred to earlier, an African-American employee working in the Affirmative Action Department who found an invoice showing that Dr. Mottoyer had submitted a request for $10,000 for seven events that Ms. Banks knew never occurred. And she raised those concerns to Sylvia Enriquez. Were those concerns raised before or after Dr. Mottoyer had indicated she was going to give this report regarding the falsification of the EEO reports? Very good point. I believe it was well before. I believe the evidence is that that happened in mid-February. In mid-February? I believe in mid-February. And when was the first inkling that Dr. Mottoyer was going to expose the EEO report? I'm sorry. What was your original question? Was it when Ms. Banks? When Ms. Banks brought this matter to the attention of the employer. Was that before or after Dr. Mottoyer had indicated she was going to expose the alleged falsification of the EEO reports? Well before. Okay. Now, so tell me when Ms. Banks reported the problem she saw. I believe it was late December of 2000, possibly the first few days of January 2001. It is in the declaration of Ms. Banks. Okay. And when was the first inkling that Dr. Mottoyer was going to expose the purported EEO falsification? Well, taking that fact as purportedly true. Based on the record. Because we have to take the facts in the light most favorably. I believe it's mid-February. Okay. February 2001? 2001. Uh-huh. Now, do you have record citations for your date of Sophia Banks and for Mottoyer? Part of what, yes. And part of what I was pointing to was we meticulously set forth the evidence of how it was brought up a chain to John McGuire. Was that in your undisputed facts? I know that's a very important date. I'm sorry. Sure. Was that in your undisputed facts? It was in our undisputed facts below in the district court. Could you cite us to the record for those? Unfortunately, they're set forth specifically in our opposition brief. In our statement of facts, we do go through where it is in the record. All right. Proceed. Perhaps you'll find it would have been really nice if you could have told us that. Those are very crucial points. But anyway, go ahead. Well, part of the issue here is we did meticulously set all that out in the district court. Go for it. And part of the problem that the district court had was we set forth all the way up through John McGuire advising the IACF. IACF voted unanimously to retain PricewaterhouseCoopers to conduct an audit of all IACF grants. Well, but the difficulty is that if we take the facts as asserted as true, even though there was a vote to look at all of the grants, the focus became on the ones that were administered by Dr. Mottorio. That's not true because Dr. Mottorio's grants were examined. But if you look at the declaration of James Hunt, who was a partner at PricewaterhouseCoopers, he specifically says that he and his partner completed the review of all IACF grants. No findings of any discrepancies in any of the others. That's correct. Okay. And that's in the declaration of James Hunt. Now, appellant has pointed to the fact that the state court found that there was a disputed issue of fact when the motion for summary judgment was filed there, and she says that it was based on the same evidence. That's not true. For example, we submitted the declaration of James Hunt. We submitted the declaration of Sophia Banks. These were two key components, the judgments that he would have liked to have seen. Well, the case was in federal district court and under Prousseau, which we cited to you in our opposition brief here before you. May I interrupt you for just a second? Sure. Of what relevance would be a state court finding? It does not have any relevance. I didn't think so. And that's why I'm citing Prousseau. Don't waste your time on that. Okay. Thank you. So, you know, they spent a lot of time talking about that. One of the things they also point to is the state court of appeal decision. What does that mean? Well, part of the reason we think it's important is that it does analyze some of the very transactions. You can't have it both ways. If the state court ruling isn't important, it's not important whether it's trial court or appeal court. So if you want to waste your time discussing the appellate court, then you waste your time discussing the trial court, too. So it's either important or it's not important. Right. Again, going back to the fact that defendants pointed to specific evidence, let the district court know exactly the reams of evidence that we had that supported the grounds for terminating Dr. Matoyer for misappropriating over $30,000. In response to that, appellant submitted a mound of evidence and basically said, Go find it yourself. See fax numbers 1 through 161. A 118-page document that had references to over 400 paragraphs of declarations and over 100 pages of deposition and requested judicial notice of the record in the state court. But the district court accepted that, though, right? The district court said, you know, I reviewed it. You still didn't point me to any specific tribal issues of fact, and that's a concern. Why should a district court, I believe the Ninth Circuit has said, act like a pig hunting for truffles in a brook? We have an obligation. When I was a district court judge, you have an obligation to review the record regardless when there's a motion for summary judgment. It's our responsibility to determine whether or not there's an issue of fact. The parties are supposed to point us to them, but we don't rely solely on that as district court judges. We also have an obligation to read everything that's in the record. Well, and Judge Walter did say he reviewed the record. But that still does not carry their burden of pointing to specific tribal issues of fact, and that was not done in this case. Now, part of our issue here, too, is we don't believe there's any issue of pretext. The statements – there are no discriminatory or retaliatory statements by Mr. McGuire, and so there is no direct evidence of discrimination. In addition, that argument – But there is circumstantial evidence. We don't believe there is circumstantial evidence. And certainly, they have not cited to substantial circumstantial evidence. Well, I guess the question that comes to my mind is how is it that no rational trier of fact could conclude that Feg's termination in Petoyer was pretextual? I think it comes back to, again, the fact that there was substantial evidence presented to the district court, and in the record, that she misappropriated over $30,000 of IACF funds. And there's no evidence that John McGuire's decision-making was in any way motivated by discrimination or retaliation. Taking that one step further, this is not a Title VII claim. These are Section 1981 claims that are at issue. Under Section 1981, the theory under Price Waterhouse that even if there was a motivating factor of discrimination or retaliation, if the same decision would have been made – You're talking about mixed motives. Mixed motive. That's correct. And the mixed motive doctrine in the Civil Rights Act of 1991 eliminated under Title VII for discrimination claims. It did not eliminate it for retaliation claims under Title VII, and Section 1981 was left alone. And several courts have continued to apply that doctrine to say that if the evidence shows that the same decision would have been made, even if there was a disputed issue of fact as to discriminatory or retaliatory animus, summary judgment is appropriate. Counsel, I've been looking through your response brief, and I cannot find a reference to those dates that you gave us regarding when Ms. Banks reported the discrepancy and when Dr. Mottorio was going to report. Sure. Could you point me to those? Yes. It's excerpts of record 51, colon 3. 51 what? At page 3. Page 3. Uh-huh. And that's for both dates? That shows when Sophia Banks first raised it, and then John McGuire in his declaration at excerpt of record 56, colon 5. Okay. I believe there's also one more cite I would like to give you. All right. Thank you. But can we continue? Your point is that under the law of 1981 and 1983, if there's mixed motive and the same decision would have been arrived at regardless whether there was racial animus, the summary judgment should be sustained. That's correct, both under section 1981. 1983 is not at issue in this case. All right. And the State law claim. What case are you relying upon for the mixed motive analysis in the 1981 case? Mabra v. United Food and Commercial Workers Local Union, 176 F. 3rd, 1357. Is that in your brief? It is. And what circuit was that? That was the 11th Circuit, 1999 decision. You don't have anything from our circuit? I have a district court opinion. Reese v. Dalton, 845 F. Supp, 742 F. 745. And that was in your brief? That was in our brief. All right. Thank you. The other citation I wanted to raise to your attention is when Elaine Graham, the concerns of Sylvia Enriquez, that's where she brought them to. She raised it with Vicki Shapiro, I believe, and that's an excerpt of record 49 at pages 6 and 7. Okay. Thank you. Now, the other issue that Appellant has raised before you is the Del Santi case, and I'd like to take a moment to distinguish that case. As she said, in that case, there was evidence that the wrongdoing issue of inflating gas reimbursement expenses, that there were 215 other people that seemed to have engaged in similar misconduct. And there was a memo that expressly said that from the employer. And in that same memo, it said that 31 people have submitted reports on numerous occasions that had that glaring problem. Now, the memo also said we should counsel those people. So they made certain admissions that it wasn't necessarily a terminable offense. Contrast that to here, where the Screen Actors Guild had an executive administrator who was a fiduciary over $100,000 in grant funds, and she had falsified invoices and given monies to her friends, business partners, and husband. Well, you know, her husband received money. And her business partner received $20,000 that went into a company called PRC, where the P stood for Patricia, her first name. And here, you know, I don't think there was any other decision that could be made that she would have to be terminated. And the fact that the IACF was a client of PWC, not the Screen Actors Guild. The IACF is an independent entity. It's made up of both the motion picture side of the business as well as members of the union side of the business. And there has to be a majority between the two different sides. While John McGuire did raise the concern that the grants should be audited, the IACF voted independently to have that audit done. And all grants were audited, and that is in the Declaration of Bruce Dow. Now, another point I would like to raise as well is Section 504 of the LMRDA prohibited Dr. McToyer from ever working at the Screen Actors Guild. And therefore, she cannot enforce a contract that was void. It was a legal nullity. Well, counsel, the problem with that argument is that we don't know what the effect of the – didn't she get some kind of expungement of the – Well, that's not exactly the words to use. And actually, this court has specifically said it's not expunged. It's not as if the state court proceeding under 1203.4, the California Penal Code – If you get a motion granted – I've done this a few times – under 1203.4, the person who has the prior conviction dismissed can, under California law, when asked, have you ever been convicted of this crime, answer no. But that's a separate issue as to whether kind of an after-acquired evidence defense might be necessary. In this case, what we have is a legal requirement that the Screen Actors Guild was not permitted to employ her. And if the guild had known – and frankly, it doesn't matter whether the guild knew or did not know, and it doesn't matter whether it was a felony or not. But was there – was the expungement prior to her being hired? It was prior. But, again, it's not an expungement. It does not release her of the fact that she was convicted of a felony. And that's a – But she can answer under oath when asked, were you convicted of a felony? If it's been expunged, she can answer no. I'm not aware of that argument in the record, and I'm not sure if you're relying on California law. I am relying on California law. Okay.  California conviction, so California law doesn't. Well, right, but – and there's a case called NASS v. Warehouse Product Sales, 503 F. Supp. 217. In that case, the district court addressed a very similar issue, whether a union could employ someone who had been convicted of a felony but had the felony set aside under a very similar statute. What state? That's New York. And – well, again, but the analysis is the same because – It's not the same. If you're relying on state law, the state law controls you. No. I mean, this is a district court opinion. What they were saying was this is an issue of Federal law under Section 504 of the Federal LMRDA. They were analyzing – Are you saying that the Federal Government says that even if California says you haven't been convicted of a felony, we say you have been? If you look at Section 504 of the LMRDA, it specifically says if you've been convicted of a felony or a similar offense, and she was convicted of a misdemeanor for Medi-Cal fraud, which is similar to larceny, and there was cases that we cited to in a brief that it doesn't have to be the same specific offense. It's enumerated. That's a bar to employment for the Screen Actors Guild. But, counsel, what we're trying to get you to understand is that the conviction, the nature of the conviction, is defined by state law. And once there has been a conviction, then it's a Federal question as to whether or not that conviction bars her. But the nature of the conviction is determined by reference to state law. Because we don't have a Federal body of law to tell us what a state conviction entails. Right. But I believe the cases I've cited to, the Nass decision in particular, does address that. But that's a New York law. New York may be different. Well, I'm saying it's analog. But under California law, once you've got a 1203.4, it never happened. Your Honor, I'd like to cite you to – I think we'd better go on to something else. You've got three minutes. Sure. Just citing you to Kelly v. INS. In this case, the court held that an alien convicted of narcotics violations was subject to deportation under Federal immigration law. Right. But that's a specific area of the law that has specific statutes that are being interpreted. You're wasting your time. All right. Finally, Your Honor, I'll just conclude in summary here that there was substantial evidence in the district court that Ms. And the Screen Actors Guild set that evidence out very specifically. That's not the issue. We're not arguing the sufficiency of the evidence after a jury conviction. You should say that there is no substantial evidence other than – Well, and I was going to point to that, because there is no substantial evidence. And the appellant failed in that duty to cite to specific tribal issues of fact. And even if she had, no reasonable jury would find that the Screen Actors Guild would not have terminated her based on the evidence that was presented to the district court. Was the mixed motives issue argued before the district court? It was argued before the district court, but the district court did not reach that decision. All right. Thank you. One minute for rebuttal. Your Honors, I want to cite you to a few places in the record that I believe deserve a second look. As to the timing question, McToyer attended a meeting in the fall of 2000, in which she presented evidence that the EEO statistics had been fraudulently inflated. John McGuire was at that meeting. The citation to the record is ER tab 38, pages 28 through 29, particularly paragraph 87. That meeting occurred in the fall of 2000. I looked at the site to the Sophia Banks evidence. I believe it was tab 51. She stated that she discovered the suspicious invoice in either late November or December of 2000. But, Counsel, when you first came to the podium, you said that the impetus for the investigation was when she said she was going to a national meeting and expose this wrongdoing. Now are you saying, are you backdating your allegation at this point? I am not, Your Honor. I believe that the question that was posed to defendant was when John McGuire may have had the first inkling that McToyer was going to blow this issue out of the water. Because that was your argument. You said once he found out she was going. Not that she said, not the discrimination allegations, but that she was going. You gave us a finite time. You said once they found out she was going to report this at some national meeting, that's when the decision was made to investigate her. So that's why those dates were crucial. That's correct, Your Honor. And the citation that I provided you just now doesn't mention the national plenary meeting. All that that citation says is that's when McToyer first said to John McGuire, among others, that the EEO statistics had been fraudulently inflated. There may be, as to when she stated she was going to take this to the national plenary, that isn't in this particular citation. But this is when she, this is when John McGuire first had any inkling that McToyer was going to make a big deal out of this in the fall of 2000. Sophia Banks then discovered the suspicious invoice in November or December of 2000. The final sites that I'd like to provide to you are what I think are some of the best evidence of pretext in this case. If you look at the Dow Declaration, which is ER tab 73 at pages 12 through 13, this is the IACF guy who talks about starting the investigation for PwC. He says, quote, IACF retained PricewaterhouseCoopers to conduct an in-depth investigation on all outstanding IACF grants. The PwC investigator, James Hunt, repeated almost verbatim the same kind of statement in his declaration, which is tab 73 at page 111. Like Dow, Hunt claimed that PwC was retained to investigate all IACF grants, and Apelli repeatedly stated that in his argument before the court. John McGuire, in his deposition testimony, was asked the following questions. And you are on the IACF board? Correct. What was the audit to be of? Answer. The audit was to be of the three grants we've been talking about. Question. Just the three grants? Correct. Answer. Yes. Was there any reason why it was limited to just these three grants that you've referred to? Answer. The reason was because of the concerns raised specifically that that's where the audit should be concentrated. That deposition testimony is contained at ER tab 4 at pages 327 through 328. This is very good evidence, these shifting explanations as to why the investigation was started and as to what the scope of the investigation was supposed to be raised sufficient evidence of pretext. This is what the state trial court concluded, and the district court must have resolved factual disputes and must have made credibility determinations to grant summary judgment. And for these reasons, I respectfully request that this court reverse the district court's conclusion. Thank you. All right. Thank you, counsel. The case of United States v. Stryker has been submitted on the briefs,
judges: D.W. Nelson, Rawlinson, Bea